**UNITED STATES of America**

v.

**Michael David MOORE.**

**No. C–CR–85–51.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

Nov. 27, 1985.

Kenneth P. Andresen, Asst. U.S. Atty., Charlotte, N.C., for plaintiff.

George V. Laughrun, II, Charlotte, N.C., for defendant.

## ORDER

ROBERT D. POTTER, Chief Judge.

### INTRODUCTION

THIS MATTER is before the Court upon the Government's Objection, filed November 1, 1985, to the Magistrate's Memorandum and Recommendation, filed October 21, 1985, whereby she recommended that Defendant's Motion to suppress certain evidence be allowed. The question before the Court is whether Defendant was illegally seized within the meaning of the fourth amendment where during an encounter with law enforcement officers the Defendant was told he would be on his way from their intended conversation as long as nothing was wrong.

The Court heard arguments of counsel on November 26, 1985 on this matter. The Defendant was represented by George V. Laughrun, II, Attorney at Law, and the Government was represented by Assistant United States Attorney Kenneth P. Andresen.

### STATEMENT OF THE CASE

On May 9, 1985, Charlotte Vice officer Don R. Harkey and Special Agent Jack A. Davis were on duty as drug interdiction officers at the Charlotte Douglas International Airport. They were observing arrivals of Piedmont Flight # 80, a non-stop flight from Miami, Florida. Defendant deplaned the flight and was observed carrying a blue nylon bag. The officers attention was drawn to Defendant when, immediately upon deplaning, he stopped in an area away from other passengers, carefully opened the blue nylon bag and peered into it. Agent Davis admitted at the Magistrate's hearing that Defendant could have been removing his ticket from the bag (Tr. 22–23), but at the scene, the officers concluded that Defendant was attempting to be secretive about its contents.

Agent Davis approached Defendant, displayed his credentials and said, "Excuse me, sir, may I talk with you?" Davis also introduced Officer Harkey who was standing five or six feet away, who likewise displayed his credentials. Both Davis and Harkey were in plain clothes. Davis told Defendant that he was not under arrest and that he and Harkey wanted Defendant's cooperation and to talk to him for a minute. Defendant agreed to talk. Davis then said "the conversation [would] take a few minutes and in all probability, if there was nothing wrong, [Defendant would] be on his way right away." (Tr. at 7, 9, 27, 47–48, 50–51.)

Then Davis asked to see Defendant's plane ticket and Defendant produced a folder containing two tickets. Davis determined from looking at the tickets that Defendant had flown to Miami the day before, had paid cash for his ticket and was carrying no luggage other than the blue nylon bag. Davis asked for Defendant's identification and while looking at the card Defendant produced, Defendant asked him, "What's this all about?" Davis replied that he and Harkey were looking for narcotics coming through the airport. Defendant stated that he did not mess with drugs. (Tr. 7, 27, 47.)

The first names on Defendant's identification card and plane ticket were different, but the officers did not consider that significant. The officers questioned Defendant about where he worked, where he was going and why he was going there. Davis was not satisfied with Defendant's answers and believed Defendant was not telling the truth. Davis then asked Defendant if he would consent to a search of his person and bag. (Tr. 7, 24–27.) After Defendant agreed to the search, Davis asked if he wanted the search conducted in a more private place. The Defendant said he would, so the three men moved a short distance away to a construction area where they stood behind a plywood wall. Davis asked Defendant if Defendant was still willing to permit the searches and Defendant stated that he was. Davis opened the nylon bag, found approximately five grams of marijuana in a plastic bag inside and immediately advised the Defendant that he was under arrest for possession of marijuana. (Tr. 7–10, 28.)

Davis continued to search the bag and found a black notebook. As Davis was examining the notebook, Defendant leaned over to reach for it. Defendant's movement dislodged a plastic bag filled with white powder which Defendant had been carrying under his vest and the bag fell into a nearby ashtray. After a brief scuffle, Defendant was subdued, handcuffed and advised that he was also under arrest for trafficking in cocaine. (Tr. 8, 29.)

After taking Defendant to the Narcotics Interdiction Unit office at the airport, Davis gave Defendant his *Miranda* warnings. Defendant indicated that he understood his rights and waived them by initialing and signing the *Miranda* form in the spaces provided. Defendant then made incriminating statements to the officers. (Tr. 11–14.)

The Defendant filed a Motion to suppress all evidence seized from his person and all statements made by the Defendant on the grounds that Defendant was illegally detained and his statements were not the product of a knowing and voluntary waiver of his *Miranda* warnings.

The Magistrate ruled that the evidence should be suppressed. She concluded that the initial encounter between the officers and Defendant was consensual; but, when Davis went on tell Defendant at the inception of the conversation that "the conversation [would] take a few minutes and, in all probability, if there was nothing wrong, he'd be on his way right away," the consensual encounter was transformed into a seizure within the meaning of the fourth amendment. The Magistrate, citing *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), stated the general rule that a seizure occurs when the individual has "some objective reason to believe that [he] is not free to end the conversation and proceed on his way." (M/R 6–7.)

The Magistrate inferred that Davis' statement was that the Defendant would not be "on his way" until the two officers confronting him determined whether there was something wrong. This provided the Defendant, concluded the Magistrate, with an objective basis to believe that he was not free to leave. The Magistrate found that Davis' subsequent statement that he and Harkey were looking for drugs served to reinforce Defendant's belief. (M/R 7.)

Further, the Magistrate ruled that since Defendant's consent to search was given at a time when he was illegally seized, then the search was illegal and the fruits of the search were illegally obtained. *See, Unit-*

*ed States v. Gooding,* 695 F.2d 78, 84 (4th Cir.1982.) Since the marijuana was discovered during an illegal search, the resulting arrest was unlawful. Also, the subsequent inadvertent discovery of the cocaine while the Defendant was illegally detained was similarly tainted. The Magistrate reached the same conclusion with respect to the black notebook. (M/R 9.)

The Magistrate also concluded that Defendant's incriminating statements given after his illegal arrest should also be suppressed. She reasoned that although *Miranda* warnings were given and understood, the taint of the illegal arrest nevertheless remained unpurged. (*Citing Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982) (confession obtained through custodial interrogation after illegal arrest should be excluded unless interveneing events break causal connection so that confession is an act of free will).) (M/R 9.)

The Government contends that the Magistrate erred in her ruling under *United States v. Mendenhall, supra.* The Government argues that because the crucial comment made by Agent Davis that if nothing was wrong Defendant would be on his way quickly occurred after the Defendant had been told by Davis that he was not under arrest and after the Defendant had already consented to talk with the agents, the *Mendenhall* reasonable person test was satisfied. Nothing transpired, according to the Government, after the initial encounter, which the Magistrate found no fault with, to transform it into a seizure. The subsequent search of Defendant's bag which resulted in the discovery of the marijuana, and later the cocaine, was based on Defendant's consent.

The Court is concerned that the officers may become overly zealous in their duties resulting in frequent and bothersome encounters with innocent persons already probably irritated with the rigors of a busy airport.

■ However, the officers' initial encounter with this Defendant was found to be consensual by the Magistrate; and the

Defendant did not raise that as an issue for the purposes of this appeal. Officers do not violate the fourth amendment where they merely approach an individual on the street or in another public place, by asking if the person is willing to answer some questions, or by putting some questions to the person if he is willing to listen. *See Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (*discussed infra* ).

## APPLICABLE LAW

The United States Supreme Court, in *United States v. Mendenhall, supra,* set forth the basic test to determine whether a seizure within the meaning of the fourth amendment has occurred. "[A] person has been 'seized' within the meaning of the fourth amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.,* 446 U.S. at 554, 100 S.Ct. at 1877. *Mendenhall* also involved an airport encounter in which two DEA officers approached the defendant after her deplaning an LA flight which had arrived in Detroit. The defendant fit certain characteristics of a drug courier profile as she was observed walking through the concourse. The DEA officers identified themselves as federal agents and asked the defendant to show them her identification and plane ticket. After discovering defendant's driver's license and ticket were in different names, the officers questioned her briefly about the discrepancy and how long she had been in California. The officers returned the license and ticket and asked the defendant to accompany them to the airport DEA office for more questioning. The defendant consented, and at the office, further consented to a search of her person and handbag even after the officer stated that she had the right to refuse to the search. Later, a female officer who arrived to conduct the search of defendant's person, also asked if she consented, and the defendant responded that she did. When told that she would have to remove her clothing, the defendant

stated that she had a plane to catch. The officer assured her that if she was carrying no narcotics there would be no problem. *Id.* at 547–49, 100 S.Ct. at 1873–74.

The Court, in holding that no seizure occurred when the agents approached her on the concourse and questioned her, stated that nothing in the record indicated that defendant had any objective reason to believe that she was not free to end the conversation in the concourse and go on her way. *Id.* at 555, 100 S.Ct. at 1877–78. Under the totality of all the circumstances, the defendant's consent to go to the airport DEA office with the officers was held voluntary. The Court found that the defendant was not told that she had to go to the office, and neither threats nor any show of force were used. *Id.* at 557–8, 100 S.Ct. at 1878–79. The facts that defendant was a 22-year-old Negroe without having graduated from high school, and was accosted by white officers, were not decisive. *Id.*

The Court went on to state that its conclusion that no seizure occurred was not affected by the fact that the defendant was not expressly told that she was free to decline to cooperate with the officers' inquiries because the voluntariness of her response did not depend on her having been so informed. *Id.* at 555, 100 S.Ct. at 1877–78.

The Court also set forth some examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, such as: the threatening presence of several officers, the display of a weapon, some physical touching, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Id.* at 554, 100 S.Ct. at 1877.

The Fifth Circuit Court of Appeals held in *United States v. Berry*, 670 F.2d 583 (5th Cir.1982) (Unit B) (en banc), that an airport stop based on a drug courier profile will be a seizure if "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id* at 595, *quoting United States v. Mendenhall, su-*

*pra,* 446 U.S. at 554, 100 S.Ct. at 1877. In *Berry,* two DEA agents observed the defendants deplaning a flight from Miami to Atlanta. One of the officers was vaugely aware of having seen a photograph of one of the defendants, Berry. Berry stared at the agents while leaving the gate and at the baggage claim where he walked by the agents several times. Berry and the other defendant, Jabish, looked nervously at the agents while making their way down the concourse. The DEA agent approached Berry outside the terminal as Berry was taking luggage toward a taxi stand where Jabish was waiting. The agent identified himself and asked to talk with Berry, inquiring of his identify and travel plans. Berry gave a false name and stated that he was travelling alone. He handed over two tickets carrying the names of David and Joanne Sarver. When asked for more identification, he produced a driver's license in the name of Dudley Berry. The agent recognized Berry as a man he had been told to watch. When Berry indicated that Jabish was with him, the agent motioned her to join them while the other agent simultaneously walked over to Jabish, may have touched her elbow, pointed to the other two men, and also asked her to join them. When the agent identified himself and asked Jabish her name, she responded that her name was Joanne Sarver. The agent informed her that Berry had admitted his true identity and asked if she wanted to change her answer. She did not reply, but appeared extremely nervous. The agent asked Berry and Jabish if they were carrying drugs and Berry responded they were not. The agent then asked Berry and Jabish to accompany him to the airport DEA office. Berry consented. On the way to the office, Berry asked whether they had violated any law. The agent told him that they had violated a Georgia law by falsely identifying themselves to police officers. He commented, however, that "there would be no problem" if a search revealed no drugs. The defendants consented to a search at the DEA office where they were both found to have been carrying cocaine. *Id.* at 587–89.

The court of appeals found that there was no seizure during the initial contact with Berry. The court noted that, although the agents stopped Berry's progress on his way to a taxi stand, they merely identified themselves and asked if they could talk with him; there was no indication of coercion. *Id.* at 603. *See Florida v. Royer, supra.* The seizure of Berry occurred, according to the court, when Berry showed the agent his driver's license and admitted that he was travelling with Jabish. By then, reasoned the court, the agent knew the defendants matched a drug courier profile, were hiding their joint travel and were travelling under aliases. He also had been told to watch for Dudley Berry. Thus, there existed a reasonable suspicion for the basis of a seizure of Berry. *Id.*

The court found that Jabish was seized when the agent came over to her, perhaps touching her on the elbow, pointing towards the other two men, while the agent with Berry was also motioning her to join them. The court stated that the "situation [appeared] closer to a command than to a request with which a reasonable person would believe he could freely comply or not." *Id.* at 604. However, the agents were found to have had reasonable suspicion for Jabish's seizure as well. *Id.*

■ The court in *Berry* pointed out that "the difference between voluntary, unintrusive communications between police and citizens and forced interrogation by police that is so intrusive as to be a seizure ... rests on fine distinctions in the degree of coercion police may use in an airport stop." *Id.* at 595. The court emphasized that the very nature of airport stops may render them intimidaing and that careful attention should be given to nuances of tone and language, such as "whether a phrase was worded as an order or a question, whether a question was so peremptory as to be a command in all but punctuation...." *Id.* at 596. The court of appeals stated that the determination of whether a seizure occurred should focus on whether the circumstances reveal the presence of any coer-

cion. Specific factors to be examined are whether the officer: (1) blocks the defendant's path or intercepts him to prevent progress; (2) retains a ticket; (3) states that an individual is suspected of smuggling drugs; and (4) informs the defendant that an innocent person would cooperate with the police. *Id.* at 597. "Statements which intimate that an investigation has focused on a specific individual easily could induce a reasonable person to believe that failure to cooperate would lead only to a formal detention." *Id.*

■ The court of appeals went on, however, to point out that even if the defendants were illegally detained because of a lack of reasonable suspicion or probable cause, the voluntary consent of the defendants was sufficient to remove the taint of an unlawful seizure. To purge any taint from an unlawful seizure, there must exist proof that the consent was voluntary and that it was not the product of the illegal detention. *Id.* at 604. *See also, Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979.) The factors to be considered are the temporal proximity of an illegal arrest and confession, intervening circumstances, and purpose and flagrancy of the official misconduct. *Berry, supra* at 605. The defendant's voluntary consent to a search of the luggage at the airport DEA office eliminated any taint of unlawful arrest following the airport stop. The defendant's consent was voluntary where, although close in time to the agent's request to go to the office, there were substantial intervening circumstances in that the defendants were told that they could decline consent, could consult with an attorney, and defendants were allowed to consult with each other, notwithstanding the absence of *Miranda* warnings. *Id.* at 604–05.

Another case related to the issue is *Florida v. Royer, supra,* where the United States Supreme Court stated that police officers do not violate the fourth amendment by merely approaching an individual in a public place and asking if he is willing to answer some questions. In that case,

the defendant purchased a plane ticket to New York City at Miami International Airport. The ticket was purchased under an assumed name which was also used on his luggage identification tags. When the defendant was proceeding to the concourse leading to the airline boarding area he was approached by two officers, who previously had observed the defendant and believed he fit a drug courier profile. The officers identified themselves and asked the defendant if he had a moment to talk with them and the defendant said he did. The officers asked to see defendant's ticket and driver's license which he produced. The driver's license bore the name "Royer", whereas the airline ticket and luggage identification tags carried the name "Holt." Royer explained that the discrepency was due to a friend of his having made the reservation in the name of Holt. Around this time, the defendant became noticeably nervous. The officers then stated that they were narcotics investigaors and that they had reason to suspect him of transporting marijuana. *Id.*, 460 U.S. at 493–494, 103 S.Ct. at 1321–22.

The officers did not return the defendant's plane tickets or license but asked him to accompany them to a room near the concourse. The defendant did not orally respond but went with the officers. Without his consent, one of the officers retrieved the defendant's luggage and brought it to the room. At the room, the defendant would not orally consent to a search of the luggage, but he did produce a key and unlocked one of his suitcases in which marijuana was found. As for his second suitcase, the defendant said he did not know the combination of the lock but that he did not object to its being opened. The officer pried the case open and found more marijuana whereupon the defendant was placed under arrest. *Id.* at 494–95, 103 S.Ct. at 1322–23.

The Court held that "when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and with-

out indicating in any way that he was free to depart," the defendant was illegally seized under the fourth amendment. *Id.* at 501, 103 S.Ct. at 1326. Those circumstances amounted to "a show of official authority such that 'a reasonable person would have believed he was not free to leave.'" *Id.* at 502, 103 S.Ct. at 1326, *citing United States v. Mendenhall, supra.*

The Court went on to state that had the officers returned the defendant's license and ticket, and informed him that he was free to go, then they could have averted "any claim that the encounter was anything but a consensual matter from start to finish." *Id.* at 504, 103 S.Ct. at 1328.

Nevertheless, the Court concluded that since the defendant was being illegally detained when he gave his consent to the search of the luggage, the consent was tainted by the illegality and ineffective to justify the search.

## DISCUSSION

In consideration of the case law, this Court is now concerned with the question of whether a reasonable person would feel he was free to proceed on his way where he has been approached by two officers who ask to speak with him, identify themselves, state that he is not under arrest but that they just want to talk for a minute, and after the person consented, state that he would be on his way in a few minutes if nothing was wrong.

With that question in mind, a review of the relevant testimony at the pretrial hearing may be helpful.

Davis concluded shortly after Defendant deplaned that Defendant's actions were significant in that he was arriving from a source city, Miami, and his actions were those of somebody trying to be secretive about the contents of the bag. (Tr. 6.) Davis and Harkey followed Defendant and approached him, when Davis said "Excuse me sir, may I talk with you." Davis then identified himself and introduced Harkey, who also identified himself. (Tr. 6.) Davis advised Defendant that he was not under

arrest, but that they just wanted to talk to him for just a minute. (Tr. 6.) The Defendant said okay; Davis then advised him "that the conversation will take a few minutes and in all probability if there was nothing wrong, he'd be on his way right away." (Tr. 7, 27.)

Three to five minutes transpired from the time of the initial encounter until the time that Defendant consented to the searches. (Tr. 27.)

It is worth noting that on direct examination, Harkey stated upon Defendant's initial encounter with Davis and while Davis identified himself and Harkey, that Harkey stood about five to six feet away. He was close enough to hear the conversation and "get involved if needed," but far enough that "I wasn't an immediate part of the conversation." (Tr. 38.) Harkey stated that he never saw Davis touch Defendant and that he heard Davis tell Defendant "that he was not under arrest and that we appreciated his cooperation in this, and we would make this as quick as possible." (Tr. 40.)

However, Harkey's rendition of the facts indicates that he may have been somewhat unsure as to when exactly the comment of "as long as there's no problem, you'll be on your way," occurred.

Q. Did you hear Agent Davis testify about his conversation with Mr. Moore and make a statement to the effect that he had told Mr. Moore he was not under arrest and if you're not someone we're interested in you'll be on your way in a few moments? Do you recall that testimony?

A. Uh-huh, he said something to that effect, yes, ma'am.

Q. Do you recall that having occurred during this conversation with Mr. Moore?

A. Seems like he said something along that effect just about the time we started to step off—you know, to walk over there, that he just—you know, if this is something we're not interested in, this will take just a

moment, or something like that, yes, ma'am. It was something along that line.

Q. And that would have been right after Mr. Moore had given his first consent to search?

A. That was after he had given his first consent to search, and we were steppin' to walk across over about 50 feet to the area where the search was made.

(Tr. 47–48.)

The Court is of the opinion that in light of the case law and sequence in which words were used and exchanged during the initial encounter, that the transaction did not amount to an unlawful seizure.

■ Davis approached Defendant and said, "Excuse me sir, may I talk with you?" At that time Davis introduced Harkey who was standing about five or six feet away and both men showed Defendant their badges, Davis saying that he was an SBI agent and Harkey a Charlotte Police Officer. Davis advised Defendant that he was not under arrest, but that they just wanted to talk to him for a minute. Defendant said okay, or words to that effect. Davis then said that the conversation "will take a few minutes and in all probability, if there was nothing wrong, he'd be on his way right away." (Tr. 6–7.)

In view of all the circumstances, it cannot be said that a reasonable person have believed he was not free to leave. There were no threats, displaying of weapons, touching, nor were there several officers. In fact, Harkey was standing about five or six feet away. There was no evidence that the officers blocked Defendant's path or tried to prevent him from proceeding on his way. The officers did not have anything belonging to the Defendant, such as his driver's license or airline ticket; and before the comment of "as long as nothing's wrong" was made, had not said anything that might lead the Defendant to believe he was suspected of smuggling drugs. Nor did the officers say anything to the effect

that an innocent person would cooperate with the police.

Instead, Davis stated that Defendant was not under arrest, but that they just wanted to talk for a minute. The Defendant consented to this much. But it is argued that the encounter was transformed into a seizure by the single statement of Davis that the conversation would take a few minutes and if there was nothing wrong, he would be on his way right away. The Court disagrees. There is no indication that the statement together with all the circumstances of the situation, appeared to be anything like a command with which a reasonable person would believe that he could not freely leave.

Thus, the Defendant's Motion to suppress is DENIED.

The Clerk is directed to certify copies of this Order to defense counsel and the United States Attorney.