**Kelly J. COLLINS, Appellant (Defendant),**

v.

**STATE of Wyoming, Appellee (Plaintiff).**

**No. 92–65.**

Supreme Court of Wyoming.

June 11, 1993.

Rehearing Denied July 20, 1993.

Before MACY, C.J., and THOMAS, CARDINE and GOLDEN, JJ., and URBIGKIT, J., Ret.

THOMAS, Justice.

 The primary issue to be resolved in this case is whether an encounter involving a police officer and Kelly J. Collins (Collins) amounted to a seizure of Collins, thus implicating his rights under the Fourth Amendment to the Constitution of the United States and Art. 1, § 4 of the Constitution of the State of Wyoming.[1] Collateral

---

1. U.S. Const. amend. IV provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Wyo. Const. Art. 1, § 4 provides:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit,

issues are presented including claims there was no factual basis to support the crime of burglary as defined in the statute; the court improperly refused to give the jury an instruction on the lesser included offense of criminal entry; the court improperly refused to instruct the jury on a definition of reasonable doubt; and the evidence was not sufficient to sustain a conviction of burglary. In addition, the State suggests an issue as to whether the jury instructions correctly stated the elements of the crime of burglary. We hold that not every encounter between police officers and citizens amounts to a seizure of the person of the citizen, thus implicating constitutional rights, and we conclude that none of the other claims by Collins or the suggestion by the State constitutes error requiring reversal. The judgment and sentence of the trial court is affirmed.

Collins sets forth these issues in his Brief of Appellant:

I. Did the trial court err when it failed to dismiss the charge against Appellant because there was no factual basis to support the crime of burglary as defined by Wyoming Statute § 6–3–301(a)?

II. Did the trial court err when it failed to suppress evidence obtained when Appellant was detained without reasonable suspicion?

III. Did the trial court err by refusing to give an instruction on the lesser-included offense of criminal entry?

IV. Did the trial court err by refusing to instruct the jury on the definition of reasonable doubt?

V. Was the evidence presented sufficient to sustain Appellant's conviction of burglary?

In its Brief of Appellee, the State says the issues should be stated in this way:

I. Does the Wyoming burglary statute, § 6–3–301(a), make unlawful the unauthorized entry of a vehicle with intent to commit larceny?

II. Did the trial court correctly deny Appellant's motion to suppress statements made by Appellant and items taken from Appellant's person?

particularly describing the place to be

III. Did the trial court correctly refuse to give the lesser included offense instruction on criminal entry?

IV. Did the trial court correctly refuse to instruct the jury on a definition of reasonable doubt?

V. Was sufficient evidence presented to the jury to sustain Appellant's conviction of burglary?

VI. Was the jury properly instructed on the elements of the crime of burglary?

On May 11, 1991, at approximately 11:20 P.M., a citizen and his wife, at their home in Cheyenne, received a telephone call from a neighbor who told them he had seen someone prowling around their car. The citizen telephoned the police, and an officer responded to the call. The officer learned from the citizen that the neighbor had described a male in dark clothing as having been observed prowling around the car, and the citizen also advised that this person had gone south on foot from the site of the reported prowling at 31st Street and Cribbon Avenue. The officer began to look around the area and, in a short while, observed a darkly-clothed figure, who later was identified as Collins, walking a few blocks south of the citizen's residence. As the officer approached Collins, he noticed a flashlight in Collins' right back pocket. The officer also observed that Collins appeared nervous and was covered with sweat although the temperature that night was in the lower 40–degree range. The officer then saw that Collins had an object concealed in the left sleeve of his jean jacket, and the officer could see a handle sticking out of the sleeve. The officer was concerned the object in the jacket sleeve might be a weapon. Furthermore, the officer saw several cassettes in Collins' pockets, but he did not see a cassette player.

While the first officer was talking to Collins, a second officer arrived, and both officers noticed that Collins was pushing something down into his left trousers pocket. When Collins was asked what was in his pocket, he told them "[n]othing." The first officer then patted down the outside

searched or the person or thing to be seized.

of Collins' pocket and felt a hard square-shaped object. He asked Collins to remove the object from his pocket, and Collins produced a cassette tape, an object different from the one the officer had felt when he patted Collins' pocket. Collins then produced an ammunition dispenser and, at that time, the second officer noticed a prescription bottle in Collins' left jacket pocket. A closer inspection of the prescription bottle disclosed it had been issued to a male person who was not Collins.

Once Collins produced the loaded ammunition dispenser, the second officer wondered if he might have a pistol to go with the ammunition. That officer then asked Collins to empty his pockets onto the hood of the police car. Collins produced a number of items including fourteen cassette tapes, two prescription bottles, which had the name of a female person on one bottle and the name of a male person other than Collins on the second bottle; a Marlboro stopwatch; a flashlight; a Bic lighter; an umbrella; a dial-a-shell .22 caliber cartridge dispenser, a yellow leather glove; and a man's wallet. Some of these items later were identified by the female person as having come from her car which was parked in the vicinity of the citizen's residence on the evening in question. The citizen also discovered an umbrella was missing from his vehicle, and he identified as his umbrella the one found on Collins by the two officers.

When Collins was asked how he acquired these objects, he first said they were given to him by a friend. Then he changed that story and explained he found them in an alley. During the investigation, it began to rain, and the second officer asked Collins to accompany him to the police station so they would be out of the rain. Collins agreed to go with the officer, and he also agreed to show him the alley in which he claimed to have found the items. Collins pointed out an alleyway a few blocks from the citizen's residence, but a careful search of the alley

by the police officer revealed no additional items.

Collins then was arrested. He was charged with, and convicted by a jury of, burglary in violation of Wyo.Stat. § 6–3–301(a) (1988).[2] Upon conviction, Collins was sentenced to a term of not less than eighteen, nor more than thirty-six, months in the state penitentiary. This appeal is taken from the judgment and sentence imposed by the trial court.

■ The most significant issue in this case is whether the initial contact with Collins was a seizure of his person implicating his rights under the Fourth Amendment to the Constitution of the United States or under the parallel provision of the Wyoming Constitution. The right to be free from unreasonable searches and seizures is one of the most cherished rights provided by both the federal and state constitutions. A comparison of the two constitutional provisions, quoted herein at n. 1, discloses substantial identity except that the Constitution of the State of Wyoming requires an affidavit to support the issuance of a warrant. Our concern in this case is to determine whether the fundamental right established by these constitutional provisions was implicated by the initial contact of Collins by the police officers.

■ In our view, this area of the law is persuasively summarized by the United States Court of Appeals for the Fifth Circuit in *United States v. Berry*, 670 F.2d 583, 591 (5th Cir.1982):

We conclude, therefore, that Supreme Court holdings sculpt out, at least theoretically, three tiers of police-citizen encounters: communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, brief "seizures" that must be supported by reasonable suspicion, and full-scale arrests that must be supported by probable cause. See, eg., *United States v. Setzer*, 654 F.2d 354 (5th Cir.1981); *United*

2. Wyo.Stat. § 6–3–301(a) (1988) provides in pertinent part:

A person is guilty of burglary if, without authority, he enters or remains in a building,

occupied structure or vehicle, or separately secured or occupied portion thereof, with intent to commit larceny or a felony therein.

*States v. Elmore,* 595 F.2d 1036, 1041 (5th Cir.1979), *cert. denied,* 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980).

In *Berry,* the court stated that the analysis begins with *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in which the Supreme Court analyzed the reasonableness of a seizure of an individual followed by a pat down and held that such a stop, though brief and short of a full-scale arrest, came within the ambit of the Fourth Amendment. In *Terry,* the Supreme Court then balanced the interest of the government against the nature of the intrusion upon the individual and ruled that, in order to accomplish a stop followed by the pat down, "reasonable suspicion" was sufficient. The opinion of the court in *Berry* pointed out that subsequent cases, including *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), and *United ed States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), have extended the *Terry* doctrine to stops made merely for investigatory purposes. The court in *Berry,* 670 F.2d at 590, also said, however:

Although the Supreme Court has extended the doctrine it articulated in *Terry* to investigative seizures, it has not necessarily concluded that all contact between citizens and police in the course of an investigation is subject to the Fourth Amendment's rigors. The Court has repeatedly stated that the Fourth Amendment neither does, nor should, inhibit voluntary interaction between police and citizens.

The ultimate holding in *Berry,* after a plethora of somewhat confusing and inconsistent precedents was discussed, with the notation that each case is factually specific and perhaps unique, was that the initial stop of Berry did not implicate any Fourth Amendment concerns. The Fifth Circuit Court ruled additional events in the totality of the circumstances had led to the presence of reasonable suspicion prior to any seizure, and further developments justified probable cause for an arrest. A significant body of federal law at all levels acknowledges and adopts, in different ways, the three-tier philosophy recognized in *Berry.*[3] Similarly, a number of states have adopted this analysis and applied it in the same way as the federal courts.[4]

---

**3.** *Florida v. Bostick,* — U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), *on remand,* 593 So.2d 494 (Fla.1992); *Florida v. Rodriguez,* 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984), *on remand,* 462 So.2d 69 (Fla.App. 3 Dist.1985); *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *I.N.S. v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *League of United Latin American Citizens Council No. 4434 v. Clements,* 923 F.2d 365 (5th Cir.1991); *United States v. Werking,* 915 F.2d 1404 (10th Cir.1990); *United States v. Tavolacci,* 895 F.2d 1423 (D.C.Cir.1990); *United States v. Gray,* 883 F.2d 320 (4th Cir.1989); *United States v. Hastamorir,* 881 F.2d 1551 (11th Cir.1989); *United States v. Thame,* 846 F.2d 200 (3rd Cir. 1988), *cert. denied,* 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988); *United States v. Campbell,* 843 F.2d 1089 (8th Cir.1988); *United States v. Berryman,* 717 F.2d 651 (1st Cir.1983), *on reh'g,* 717 F.2d 650 (1st Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 125 (1984), *reh'g denied,* 466 U.S. 994, 104 S.Ct. 2376, 80 L.Ed.2d 848 (1984); *United States v. Black,* 675 F.2d 129 (7th Cir.1982), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983); *United States v. Steele,* 782 F.Supp. 1301 (S.D.Ind.1992), *judgment aff'd,* 989 F.2d 502 (7th Cir.1993); *United States v. Roser,* 724 F.Supp. 426 (E.D.La.1989); *Floyd v. United States,* 677 F.Supp. 1083 (D.Colo.1987), *rev'd on other grounds,* 860 F.2d 999 (10th Cir.1988); *United States v. Galindo–Hernandez,* 674 F.Supp. 979 (E.D.N.Y.1987); *United States v. Pirelli,* 650 F.Supp. 1254 (D.Mass.1986); *United States v. Zapata,* 647 F.Supp. 15 (S.D.Fla.1986); *United States v. Moore,* 625 F.Supp. 305 (W.D.N.C. 1985).

**4.** *Ex Parte Betterton,* 527 So.2d 747 (Ala.1988); *People v. Harris,* 15 Cal.3d 384, 124 Cal.Rptr. 536, 540 P.2d 632 (1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976); *Wright v. State,* 418 So.2d 1087 (Fla.App. 1 Dist. 1982), *review denied,* 426 So.2d 29 (Fla.1983); *Aguero v. State,* 169 Ga.App. 462, 313 S.E.2d 735 (1984); *People v. Murray,* 137 Ill.2d 382, 148 Ill.Dec. 7, 560 N.E.2d 309 (1990); *Wold v. State,* 430 N.W.2d 171 (Minn.1988); *Appelgate v. Comm'r of Pub. Safety,* 402 N.W.2d 106 (Minn. 1987); *State v. Perkerol,* 77 N.C.App. 292, 335 S.E.2d 60 (1985), *review denied,* 315 N.C. 595, 341 S.E.2d 36 (1986); *State v. Watley,* 109 N.M. 619, 788 P.2d 375 (App.1989), *cert. denied,* 109 N.M. 563, 787 P.2d 1246 (1990); *State v. Lopez,* 109 N.M. 169, 783 P.2d 479 (App.1989); *Mitchell v. State,* 831 S.W.2d 829 (Tex.App.–Houston (1 Dist.) 1992); *State v. Chisholm,* 39 Wash.App. 864, 696 P.2d 41 (1985); *Eatherton v. State,* 761 P.2d 91 (Wyo.1988), *appeal after remand,* 810

In accepting this approach, one of the leading texts on search and seizure articulates the following theory:

What are needed and appropriate in this context are "selective investigative procedures" whereby seizures are made only of those whom there exists a "reasonable possibility" of their being the robber.

The central question, then, is what combinations of facts and circumstances will suffice to establish this reasonable possibility. No litmus paper test is available to resolve this issue, but yet it is possible to identify several factors which are appropriately taken into account in making this judgment. Generally, it may be said that consideration may properly be given to: (1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation.

3 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 9.3(d) at 461 (1987).

■ An analysis of these factors as they appear in this case illustrates Collins' constitutional rights were not infringed. The first factor relates to the particularity of the description given to the police officer, that the prowler was a teenager, of average size, possibly a male, in dark clothing. The question raised is the adequacy of this description to afford a sufficient basis for "selective investigative procedures." The time was after 11:20 P.M.; the place was a residential street in Cheyenne; and Collins was the only person observed by police officers in the area. Collins was male, twenty-nine years old, and he was wearing dark clothing. Under these circumstances, an adequate description was available to the police officers as a sufficient basis to contact Collins for investigatory purposes. Authorities cited previously demonstrate the contact would have been appropriate in this instance without any description.

The second factor in the test is the size of the area. The car prowling occurred at 1222 West 31st Street, and the officers were advised that the prowler walked south on Cribbon Avenue. The officers encountered Collins some three and a half blocks away from the alleged burglary. The fact Collins was walking away from the site of the reported offense and had traveled a little more than three blocks leads to a conclusion the initial contact occurred within the range of possible flight.

A third factor is the number of people in the area. As illustrative of this factor, the text author cites *People v. Juarez*, 35 Cal. App.3d 631, 110 Cal.Rptr. 865 (1973), in which the court held that it was lawful to stop a person walking down the street near a recently-reported burglary when he " 'was the only pedestrian in the vicinity of the burglary that had occurred 10 minutes before.' " 3 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 9.3(d) 470.[5] Collins was the only person the officers observed in the vicinity of the reported car prowling.

P.2d 93 (Wyo.1991); *Sanchez v. State*, 751 P.2d 1300 (Wyo.1988); *Cutbirth v. State*, 663 P.2d 888 (Wyo.1983). *See Grant v. State*, 55 Md.App. 1, 461 A.2d 524 (1983), *cert. granted*, 466 A.2d 39 (Md.1983), *cert. dismissed*, 299 Md. 309, 473 A.2d 455 (1984).

5. *See* 3 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 9.3(d) 470–71, n. 273, which also cites the following cases:

*See also People v. Herron*, 89 Ill.App.3d 1048, 45 Ill.Dec. 641, 412 N.E.2d 1365 (1980) (no description of suspect, stop within min-utes of robbery and within one and a half blocks, it after midnight "and there was no one else around" and defendant walking away from store robbed); *State v. Fernandez*, 691 S.W.2d 267 (Mo.1985) (where 1 a.m. phone call that armed persons at certain intersection, police could detain those in car there, as they [were] the only persons in the area); *State v. Maya*, 126 N.H. 590, 493 A.2d 1139 (1985) (officers without description of man who had burglarized jewelry store could stop defendant at 1 a.m. near scene 15 minutes later, as street virtually deserted).

The fourth factor is the known or probable direction of the offender's flight. When the police officers arrived at the citizen's residence, they were informed the suspect had gone south on Cribbon Avenue. Using that information, the police officers drove about a block and a half south and a block and a half east where they encountered Collins. He was within three and a half blocks of the site of the reported burglary. Taking account of the fact he was walking away from the area of the citizens' residence where the burglary had taken place together with the fact that he had covered approximately three blocks on foot supports the conclusion that the contact in this case occurred within the range of possible flight.

The next factor, number five, is the observed conduct of the person contacted. The first officer explained he stopped Collins because he was in the area; he was out at that time of the night; he was dressed in dark clothes; and he did not see anyone else in the area. These facts made it appropriate for him to contact Collins in the course of his investigation of the report of a car prowler. The officer then noticed Collins' forehead was covered with sweat, and he appeared nervous when the officer called to him. Upon closer observation, the officer noted Collins had something stuck up "his left sleeve jacket of his coat." This additional information made it reasonable for the officer to pursue the encounter with questions of Collins, even though the sixth factor, knowledge or suspicion that the person was involved in other criminality on an earlier occasion, has no application to this case.

In summary, the following factors are encompassed in the circumstances in this case. First, it was after 11:20 P.M.; second, a reported burglary of a vehicle had just taken place and been reported; third, within three and a half blocks of the scene of that reported burglary, police officers observed a male, dressed in dark clothing, walking away from the scene going in the direction reported; fourth, the male matched a description furnished by an observer of the burglary; and fifth, he was the only person observed in the area.

Upon contacting the individual, the officers also noted his forehead was covered with sweat, and he had something stuck in the left sleeve of his coat. These several factors comprised the particular and objective basis for the initial contact with Collins as the officers pursued their investigation of possible criminal activity.

A strong line of authority in California supports our resolution of this case. The Supreme Court of California has stated their rule in this way:

It is well established that a temporary detention may be justified by circumstances falling short of probable cause to arrest a suspect. (*People v. Mickelson* (1963) 59 Cal.2d 448, 450, 30 Cal.Rptr. 18, 380 P.2d 658.) In amplification of this principle we recently explained, "[a] police officer may stop and question persons on public streets, * * * when the circumstances indicate to a reasonable man in a like position that such a course of action is called for in the proper discharge of the officer's duties. [Citations.] The good faith suspicion which warrants an officer's detention of a person for investigative reasons is necessarily of a lesser standard than that required to effect an arrest. [Citation.] Where there is a rational belief of criminal activity with which the suspect is connected, a detention for reasonable investigative procedures infringes no constitutional restraint. [Citation.]" (*People v. Flores* (1974) 12 Cal.3d 85, 91, 115 Cal.Rptr. 225, 228, 524 P.2d 353, 358; see *People v. Gale* (1973) 9 Cal.3d 788, 797–798, 108 Cal.Rptr. 852, 511 P.2d 1204; *Irwin v. Superior Court* (1969) 1 Cal.3d 423, 426–427, 82 Cal.Rptr. 484, 462 P.2d 12.) *People v. Harris*, 15 Cal.3d 384, 124 Cal. Rptr. 536, 538–39, 540 P.2d 632, 634–35 (1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976).

Other cases from California consistently apply this articulation of the rule. *E.g., People v. Superior Court of Santa Clara County*, 85 Cal.App.3d 1020, 149 Cal.Rptr. 349 (1978); *People v. Allen*, 50 Cal.App.3d 896, 123 Cal.Rptr. 80 (1975); *Juarez*, 110 Cal.Rptr. 865. This reasoning has been

accepted in Minnesota and New Mexico. *Wold v. State*, 430 N.W.2d 171 (Minn.1988); *Appelgate v. Comm'r of Pub. Safety*, 402 N.W.2d 106 (Minn.1987); *State v. Watley*, 109 N.M. 619, 788 P.2d 375 (App.1989), *cert. denied*, 109 N.M. 563, 787 P.2d 1246 (1990).

We choose to adopt the *Berry* analysis and, in applying it to the facts of this case, we hold police officers need neither reasonable suspicion, nor probable cause, to arrest in order to make contact with a citizen. The first officer and, later, the second officer initially contacted Collins in a first tier encounter, which does not implicate Fourth Amendment rights. The Fourth Amendment was not implicated until reasonable suspicion justified his seizure. Any holding to the contrary would require our police officers to simply shrug their shoulders and allow crimes to occur or, in an instance like this, allow a suspect to flee. That result would not be compatible with previous cases from this court, particularly those in which we have stated that, in such situations, the police may make an investigatory stop. *See Olson v. State*, 698 P.2d 107 (Wyo.1985).

After the first tier encounter, the reasonable suspicion, which justified detaining Collins for investigation, developed quickly. The investigation led rather promptly to probable cause for his arrest. Those various stages can, and it would appear often do, occur rapidly. For example, we cite *Wright v. State*, 418 So.2d 1087 (Fla.App. 1 Dist.1982), *review denied*, 426 So.2d 29 (Fla.1983), in which the court adopted the three-tier analysis of *Berry* for initial police encounters with citizens. The court, in fact, held it need not confront the validity of the initial contact because, in its view, the reasonable suspicion was present to stop Wright. Still, it held the initial contact, based on an anonymous tip followed by surveillance of the area by a trained detective, was activity within the first tier. Similarly, in *Grant v. State*, 55 Md.App. 1, 461 A.2d 524 (1983), *cert. granted*, 466 A.2d 39 (Md.1983), *cert. dismissed*, 299 Md. 309, 473 A.2d 455 (1984), the court approved an initial contact by an officer with the defendant and noted that, from the conversation, the answers raised an articulable suspicion which soon ripened into probable cause, eventually leading to a warrantless seizure of suitcases containing cocaine. The court there said:

> The investigative behavior in this case was a model of both thoroughness and restraint. Had they done other than what they did, the police would have been derelict and the scourge upon our society that is the drug traffic would have gone on unabated. *Grant*, 461 A.2d at 525.

These two cases resemble this case, and it is clear the continuum described in *Berry* and the other cases following it is precisely what occurred with Collins.

■ Since we hold there was no seizure of Collins in violation of his constitutional rights, we then turn to the other issues he asserts in this appeal. The first of those is his claim that there was no factual basis to support the conviction of burglary which is coupled with his fifth issue relating to a claim of insufficient evidence to sustain the burglary conviction. Collins contends the evidence presented does not support a conviction for burglary under Wyo.Stat. § 6–3–301(a). He argues that the language of the statute requires a vehicle to be an "occupied vehicle" in order to be the subject of a burglary. We agree with the State, however, that the proper construction of the Wyoming statutory scheme includes unauthorized entry into vehicles with intent to commit larceny or felony therein, without regard to whether or not the vehicle is occupied.

More precisely, Collins' argument is that, since no comma is present in the statutory language following the word "structure," the legislature intended the word "occupied" to modify both "structure" and "vehicle." Collins' argument does not account for the definition of "occupied structure" found in Wyo.Stat. § 6–1–104(a)(v) (1988) (emphasis added):

> "Occupied structure" means a structure or vehicle whether or not a person is actually present:

(A) Where any person lives or carries on business or other calling;

(B) Where people assemble for purposes of business, government, education, religion, entertainment or public transportation;

(C) Which is used for overnight accommodation of persons; or

(D) In which a person may reasonably be expected to be present.

Collins' argument is that it is impossible to burglarize a vehicle, if it is not occupied. This contention completely eliminates the thrust of the definition of "occupied structure" as alluding to a vehicle, "whether or not a person is actually present," but "[i]n which a person may reasonably be expected to be present." In our judgment, Collins' argument does not fit the requirement that statutes are to be construed in a way that gives meaning to all of the language and, further, it does not account for the very real difficulty one might encounter in entering a vehicle when a person actually is present. We are satisfied the legislature did not intend the word "occupied" to modify vehicle as it appears in the statute. The word "vehicle" stands alone. We also agree with the argument of the State that the legislature does not routinely invoke commas between the last two items in a series, as evidenced by other provisions in the Wyoming Criminal Code. Furthermore, we note that, in *Jennings v. State*, 806 P.2d 1299 (Wyo.1991), we affirmed a conviction of burglary of two automobiles. Consistently, with that opinion, we hold that the crime of burglary as defined by Wyo.Stat. § 6–3–301(a) can be committed by the unauthorized entry of any vehicle, whether a person is present or not, with the intent to commit larceny therein.

With respect to Collins' challenge of the sufficiency of the evidence to convict him of burglary, we invoke our standard of review for sufficiency of the evidence:

" '[T]his court must determine whether, after viewing the evidence and appropriate inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime to have been proven

beyond a reasonable doubt.' " *Jennings v. State*, 806 P.2d 1299, 1302 (Wyo.1991) (quoting *Munson v. State*, 770 P.2d 1093, 1095 (Wyo.1989)).

*Dreiman v. State*, 825 P.2d 758, 760 (Wyo. 1992).

■ The elements of the crime of burglary required the jury to find Collins guilty if the State proved that, in Laramie County, Collins entered the vehicle without authority and with intent to commit larceny. The primary thrust of the challenge by Collins is the insufficiency of the evidence to establish the element of entry without authority. Collins argues that the State failed to proved this element because trial testimony concerned only permission to take tapes without regard to permission to enter the vehicle.

We quote a colloquy from the record between the prosecutor and one of the victims, who had possession of the vehicle when Collins took certain items from it:

Q. Okay. Did anyone have any permission to go into that car and remove these tapes from that vehicle?

A. No.

In the same vein, the prosecutor also asked the owner of the vehicle the following question:

Q. Did anyone have any consent to take anything from your vehicle?

A. No.

The jury heard this testimony and clearly could infer from it that no one had permission to enter the vehicle. We hold the evidence was sufficient for the jury to conclude the crime of burglary had been established.

Certainly, there is no question Collins entered the vehicle. That is established by his possession of cassette tapes, prescription bottles bearing the names of the owner and the person who had possession of the vehicle, a flashlight, a Bic lighter, and a Marlboro stopwatch when he was contacted by the officers on the night of the alleged burglary. These were the same items reported missing from the car by the owner and the person in possession. With respect to intent to commit the crime of larceny at the time of entry, that element was not a

disputed issue at trial. Collins simply denied entering the vehicle. The rationale found in *Jennings* is controlling on this issue:

"A reasonable mind recognizes that people do not usually break into and enter the building [or vehicle] of another under the shroud of darkness with innocent intent and that the most usual intent is to steal." *Mirich [v. State]*, 593 P.2d [590] at 593 [ (Wyo.1979) ]. The same authority also stands for the proposition that direct evidence is not necessary to prove intent to steal since "[p]roof of intent is not a precise process." *Mirich*, 593 P.2d at 593. The quantum of proof from which a jury is permitted to draw the required inference of intent to steal is dependent upon the totality of the circumstances. *Mirich. Jennings*, 806 P.2d at 1303.

■■■ Collins was found in possession of property that had been stolen. It certainly is permissible for a jury to infer from possession of stolen property that the person obtained it from a vehicle by entering it with intent to steal. We have no difficulty in concluding there was sufficient evidence for the jury to find Collins guilty of burglary. The possession by Collins of the identical property reported missing from the vehicle within a short time after the report of prowling, together with the testimony of the victims that no one had been given permission to enter the vehicle or take anything from it, justifies the conclusion of the jury that Collins had the specific intent to deprive those people of their property and commit larceny when he unlawfully entered the vehicle.

In a second issue related to his apprehension, Collins contends there was no reasonable suspicion to detain him. In light of the analysis we have adopted concerning the initial contact, during which reasonable suspicion developed resulting in the seizure of the property and the ultimate arrest of Collins, we address this issue only briefly. Promptly after the initial contact, the officers reached a level of reasonable suspicion to justify a stop in accordance with *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884,

wherein the Supreme Court of the United States said:

Each case of this sort will, of course, have to be decided on its own facts. We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, wherein the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or other's safety, he is entitled to for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

In *Lopez v. State*, 643 P.2d 682, 683 (Wyo. 1982), we adopted the following standard for determining the presence of reasonable suspicion to stop:

We must look at the totality of the circumstances to determine what cause is sufficient to allow law enforcement officers to stop a person. Based upon the whole picture, the detaining officers must have a particular and objective basis for suspecting the particular person stopped of criminal activity. *U.S. v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

In this case, the record demonstrates that, when the officers stopped Collins and questioned him, they quickly acquired the reasonable suspicion to detain him. We note the following articulable factors that support our determination: the first officer observed Collins was nervous and sweating, although it was a cool evening; Collins had some object stuck up his left sleeve with the handle sticking out; his jacket pockets were bulging; and he had a prescription bottle in his left pocket that had a name other than his on it. After that, both officers observed Collins shoving something into his left trouser pocket, and the frisk that followed, which was valid under *Terry* because the police officers then had

a reasonable suspicion Collins might be armed, disclosed the other items that were seized. The first officer testified at trial about his belief that it was possible for the object concealed in Collins' sleeve to have been a weapon. The totality of these circumstances supports reasonable suspicion and justifies the denial by the trial court of the motion to suppress the evidence and to suppress Collins' statements.

In his third issue, Collins claims there was error on the part of the trial court in refusing to instruct the jury on the lesser included offense of criminal entry. Wyo.Stat. § 6–3–302 (1988) provides, in pertinent part:

> (a) A person is guilty of criminal entry if, without authority, he knowingly enters a building, occupied structure, vehicle or cargo portion of a truck or trailer, or a separately secured or occupied portion of those enclosures.

The difference between the crime of burglary and the crime of criminal entry is the specific intent to commit larceny or a felony, which is an element of the crime of burglary. Collins did not object to the refusal of the trial court to give the requested lesser included offense instruction and, therefore, this claim must be analyzed under the doctrine of plain error.

The standard required for review under the plain error analysis is well established:

> First, the record must be clear as to the incident which is alleged as error. Second, the party claiming that the error amounted to plain error must demonstrate that a clear and unequivocal rule of law was violated. Finally, that party must prove that a substantial right has been denied him and as a result he has been materially prejudiced.

*Craney v. State,* 798 P.2d 1202, 1204 (Wyo. 1990) (citations omitted). *Farbotnik v. State,* 850 P.2d 594 (Wyo.1993); *Derksen v. State,* 845 P.2d 1383 (Wyo.1993); *Hampton v. State,* 558 P.2d 504 (Wyo.1977).

Our rule with respect to the requirement for instruction on a lesser included offense is that it must be given when:

> (1) a proper request is made; (2) the elements of the lesser included offense are identical to some of the elements of the greater offense; (3) there is some evidence that would justify conviction of the lesser included offense; (4) the proof on the element, or elements, differentiating the two crimes is sufficiently in dispute so that the jury may consistently find the defendant innocent of the greater and guilty of the lesser included offense; and (5) mutuality exists such that the lesser included offense charge can be demanded by either the prosecution or the defense. *Keller v. State,* 771 P.2d 379, 383–84 (Wyo.1989).

Application of these criteria to the record in this case supports our holding that the trial court properly refused to give the instruction.

As we have noted earlier, there was no factual dispute as to whether Collins entered the vehicle, with or without the intent to commit larceny or felony. Collins' theory of the case was that he never entered the vehicle at all. If sufficient evidence is not present from which a reasonable juror could find a defendant guilty of the lesser included offense, the instruction should not be given. *Carey v. State,* 715 P.2d 244 (Wyo.1986), *cert. denied,* 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986). *Compare Griego v. State,* 761 P.2d 973 (Wyo.1988) (holding under the facts of that case, since the element which distinguished the two crimes, the age of the victim, was not disputed at trial, it was proper for the trial court to refuse to give the jury instruction on the lesser included offense of fourth degree sexual assault), and *Warren v. State,* 835 P.2d 304 (Wyo.1992) (holding under the facts of that case, since no evidence was offered to prove that a shoe was not a deadly weapon, it was proper for the trial court to refuse to offer a lesser included offense instruction, a theory of the case instruction on simple battery). There was no error in this instance. The jury would have had to disregard completely the only evidence of the intent to commit larceny or a felony, which was the possession of the stolen property, in order to justify the conviction under the claimed lesser included offense instruction.

■ Collins also claims error with respect to the failure of the trial court to instruct the jury on the definition of reasonable doubt. We have held:

> We said as early as 1913 that it is not error to refuse to give a definition instruction, and as late as 1971 (*Alcala* case) that trial courts would be well advised to avoid such an instruction. The phrase "reasonable doubt" is self-explanatory and definitions do not clarify its meaning but rather tend to confuse the jury. Instructions defining it are unnecessary and should not be given. *Bentley v. State*, 502 P.2d 203, 207 (Wyo.1972).

We made this proposition even more precise some two years later when we reversed a conviction relating to a confusing instruction defining reasonable doubt. We then said:

> Our disposition of this case should make it clear that hereafter our court will consider it reversible error to give a confusing instruction defining reasonable doubt. *Cosco v. State*, 521 P.2d 1345, 1346 (Wyo.1974).

The trial court faced reversal if it gave the instruction on the definition in light of *Cosco*. We hold the decision to withhold that instruction was not erroneous, but was a correct ruling by the trial court based upon Wyoming precedent.

■ The State raises a collateral issue of significant import. The elements instruction, Jury Instruction No. 10, did not correctly state the elements of the offense:

1. The crime occurred within the County of Laramie on or about the date of May 11, 1991; and
2. That the defendant intentionally entered;
3. A vehicle;
4. Without authority, and;
5. Did steal a flashlight, a Bic lighter, a stop watch and cassette tapes.

If you find from your consideration of all of the evidence that any of these elements has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

If, on the other hand, you find from your consideration of all of the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find the defendant guilty.

This instruction omitted the necessary element of intent as a part of the instruction and substituted therefor the actual theft of property. This instruction is incorrect, and its import merits discussion, even though Collins did not assert this error. Collins concedes Instruction No. 10 does not include the element of intent for the crime of burglary. He contends it was plain error, and he was materially prejudiced in violation of his constitutional right to a fair trial. If the State had not raised this matter in its briefing, it is likely Collins would not have asserted it. We commend the State for bringing the matter to the attention of the court in the interests of justice; however, we do not find plain error.

The State argues any potential error is cured because the necessary elements were set forth in Instruction No. 9. Instruction No. 9 indeed does set forth all of the essential elements of the crime of burglary with the requirement that the prosecution establish all of the material allegations of the Information beyond a reasonable doubt. We accept the State's position, but we caution members of the bar as well as our trial courts that an instruction such as this is a misstatement of the law and, if Collins had objected at trial, we might have been required to reverse. Since this irregularity was not noted, nor objected to at trial, nor briefed by Collins on appeal, it essentially is waived, and we apply the plain error doctrine to hold no error is present in this case.

In this regard, we note that, in addition to the requirement of instruction No. 9 that the State prove Collins unlawfully and feloniously entered a 1984 Mercury Capri without authority and with intent to commit larceny or felony therein beyond a reasonable doubt, Instruction No. 12 sets forth the definition of specific intent:

> The crime charged in this case is a serious crime which requires proof of specific intent before Kelly Collins can be convicted. Specific intent, as the term implies, means more than the general

intent to commit the act. To establish specific intent the state must prove that the defendant knowingly did an act which the law forbids, specifically intending to violate the law. Such intent may be determined from all the facts and circumstances surrounding the case.

An act or a failure to act is "knowingly" done, if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

Our general principles relating to the construction of jury instructions is well known. The trial court has a duty to instruct the jury on the general principles of law applicable to the case. *Evans v. State*, 655 P.2d 1214 (Wyo.1982). Instructions must be considered as a whole, and individual instructions, or parts of them, should not be singled out and considered in isolation. *Ostrowski v. State*, 665 P.2d 471 (Wyo.1983); *Scheikofsky v. State*, 636 P.2d 1107 (Wyo.1981). Furthermore, before a conviction will be reversed because of an incorrect instruction, prejudice to the defendant must be shown to have occurred. *Craney v. State*, 798 P.2d 1202; *Ballinger v. State*, 437 P.2d 305 (Wyo.1968). In addition, in Wyoming, an instruction which is erroneous becomes the law of the case unless a plain or fundamental error can be demonstrated. *Sanchez v. State*, 751 P.2d 1300 (Wyo.1988), followed in *Eatherton v. State*, 761 P.2d 91 (Wyo.1988), *appeal after remand*, 810 P.2d 93 (Wyo.1991).

When Instructions 9, 10, and 12 are read together, they convey to the jury a requirement that Collins must have had the intent to commit larceny or felony at the time he entered the vehicle. We are not persuaded the jury was misled in this case by the erroneous instruction or that Collins experienced any prejudice. He did not raise the element of intent at trial as part of his defense, and there is nothing in the record to suggest he entered the vehicle without the intent to commit larceny. In closing argument, counsel for Collins stated, "I would submit the State has failed to prove this case beyond a reasonable doubt that Mr. Collins entered unlawfully this vehicle or any vehicle with an intent to deprive the owner of his property." His claim of prejudice in this regard has a hollow ring. Collins did not object to this instruction at trial, and he has not demonstrated plain error in accordance with former Wyo. R.Crim.P. 49(b) (now Wyo.R.Crim.P. 52(b), effective March 24, 1992). *See Cutbirth v. State*, 663 P.2d 888 (Wyo.1983).

Collins' conviction and the judgment and sentence are affirmed in all respects.

GOLDEN, Justice, dissenting, in which URBIGKIT, J. (Retired), joins.

I dissent from the majority's conclusion that the initial stop of appellant is a mere "first tier encounter" or "contact" with police. By categorizing police action in this manner, the majority fails to recognize the Fourth Amendment protections inherent in a *Terry* stop conducted without reasonable articulable suspicion.

On the night of May 11, 1991, at approximately 11:20 p.m., Floyd Esquibel phoned the Cheyenne police to report a prowler. Mr. Esquibel did not personally observe the prowler but had been notified by a neighbor that someone had been prowling around his car that night. According to Mr. Esquibel, the neighbor described the suspect as a teenager, of average size, possibly a male. When Officer Lusher arrived on the scene, Mr. Esquibel gave a description of the prowler to which the officer testified as follows:

Q. And did Mr. Esquibel give you a description of the car prowler?

A. Other than he thought he was male and dark, dark clothing. That was it. *He didn't have any real description.*

Q. But he wasn't certain whether he was male or whether the person was male or female, is that correct?

A. My memory of it was that he mentioned that it was a male, but he just didn't—it was too dark to see anything other than that, basically.

Q. In other words, he didn't tell you what the prowler was wearing, what— whether he was tall, short, medium, whether he had curly hair, straight hair, or—

A. No.

Q. What race he was?

A. The figure was just described male and basically a dark figure.

(Emphasis added). We note that at the time of this incident, appellant was twenty-nine years old. Further, there is no evidence in the record to indicate whether Mr. Esquibel's neighbor, the eyewitness, was ever questioned by the police.

While Officer Lusher was present, Mr. Esquibel checked his car and "couldn't determine if anything was missing." Officer Raybuck, who came later on the scene, testified that when asked whether anything was missing from his car, Mr. Esquibel stated to "the best of his knowledge, no."

Mr. Esquibel indicated to Officer Lusher that the suspect had gone south from the location of the Esquibel residence on 31st Street and Cribbon. Officer Lusher then left the Esquibel residence and drove approximately a block and a half to two blocks south and then a block and a half east before he came upon appellant. Officer Lusher testified that he pulled up behind appellant in his vehicle and called to him, *his intention being to get appellant to stop*. Officer Lusher's observations of appellant before stopping him were as follows:

Q. When you first saw the defendant while you were still in your car, what did you notice about him?

A. That he was dressed in dark clothing * * *.

Q. Could you describe his clothing?

A. As I got a little closer, I could see it was a jean jacket, blue jeans.

Q. Did you notice anything else about him at this time while you were in your car?

A. While I was in my car, I noticed that he had a—one of those black metal mag lights sticking out of his right pocket.

*     *     *     *     *     *

Q. He wasn't trying to avoid you or anything of that nature, was he?

A. *No. He was walking down the street, and I stopped him.*

(Emphasis added).

Officer Lusher testified that appellant was stopped on suspicion that he was the prowler. The officer made this determination by considering the following factors:

The fact that I didn't see anybody else in the area, the fact that he had a flashlight in his back pocket, was dressed in dark clothing, he was out at that time of night.

Only after Officer Lusher called to appellant to stop did he notice that appellant's "forehead was covered in sweat, he appeared nervous." Officer Lusher also testified that he did not observe any weapons on appellant before the stop but that only after the stop did he notice that appellant had "something stuck up his left sleeve jacket of his coat, he had some type of handle on it." Officer Raybuck arrived in a patrol car in less than five minutes. There is no testimony in the record to indicate whether the police officers were armed.

The initial stop of appellant before the search presents the threshold question:

Was there "reasonable suspicion" to stop appellant, based on the description given to the patrolling officer that the suspect was a teenager, of average size, possibly a male in dark clothing?

The scope of a permissible investigative stop and frisk was first discussed by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry*, a police officer with thirty-nine years of experience observed, during daylight hours, two suspects as they took turns walking back and forth in front of a store front window roughly twenty-four times, pausing to stare into the window and then converse together on the street corner. *Terry*, 392 U.S. at 23, 88 S.Ct. at 1881, 20 L.Ed.2d at 907. The police officer deduced that the men were casing the store for an eventual robbery and stopped the men, frisking them for weapons. The Court analyzed the reasonableness of the seizure by balancing the governmental interest justifying intrusion with

the "constitutionally protected interests of the private citizen." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1879, 20 L.Ed.2d at 905. The Court stated that the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* The Court concluded that "[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Id.*

The Court has reaffirmed that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604, 612 (1985). It is clear from the opinions following *Terry* that the Supreme Court has not varied from this basic requirement. *United States v. Place*, 462 U.S. 696, 700–01, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110, 116 (1983); *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236–37 (1983); *Michigan v. Summers*, 452 U.S. 692, 699 and n. 7, 101 S.Ct. 2587, 2592 and n. 7, 69 L.Ed.2d 340, 347 and n. 7 (1981).

In determining what constitutes a "seizure" and thus implicates Fourth Amendment rights, the Supreme Court has stated

> a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. * * * The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals."

> \*   \*   \*   \*   \*   \*

> We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *United States v. Mendenhall*, 446 U.S. 544, 553, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980) (footnote and citations omitted).

In a recent case, the Court clarified the "only if" language employed in *Mendenhall* by noting it to be "a *necessary*, but not a *sufficient* condition for seizure * * * effected through a 'show of authority.'" *California v. Hodari, D.*, 499 U.S. ——, ——, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690, 698 (1991). The Court went on to say:

> *Mendenhall* establishes that the test for existence of a "show of authority" is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.

*Hodari*, 499 U.S. at ——, 111 S.Ct. at 1551, 113 L.Ed.2d at 698. And since "policemen do not command 'Stop!' expecting to be ignored," the citizen must comply with this order before a "stop" carrying the *Mendenhall* indicia will be considered a seizure. *Hodari*, 499 U.S. at ——, 111 S.Ct. at 1551, 113 L.Ed.2d at 698.

*Wyoming Cases:*

The sufficiency of probable cause for a search was first discussed by this court in *State v. Kelly*, 38 Wyo. 455, 268 P. 571 (1928). The search of an automobile for intoxicating liquor was upheld, based initially on a tip from a Hot Springs County deputy sheriff which gave a physical description of the vehicle's passengers (a fat, heavy-set man and a small man) and a partial description of the vehicle. *Kelly*, 38 Wyo. at 457, 268 P. at 571. The description

of the passengers and vehicle was confirmed by a Washakie County sheriff, along with his observations that the men appeared to be agitated and the rear of the vehicle contained small kegs. *Kelly*, 38 Wyo. at 457, 268 P. at 571. Chief Justice Blume stated for the court:

> We might not have been satisfied in the instant case to uphold the trial court, if the probable cause had rested solely upon the information given by the Deputy Sheriff to the Sheriff in this case, *but that information was strengthened by reason of the other suspicious circumstances in the case,* warranting the court, we think, in its holding. *Kelly*, 38 Wyo. at 460, 268 P. at 572 (emphasis added).

In a case involving an improper arrest, we cited *Terry*, noting that "[t]emporary detention for limited investigatory purposes, as well as a full blown arrest, is protected by the Fourth Amendment" and inferred that the "test of any governmental invasion of a citizen's personal security is its reasonableness in the light of all the surrounding circumstances." *Rodarte v. City of Riverton*, 552 P.2d 1245, 1251, n. 2 (Wyo.1976).

This court first discussed a permissible stop and frisk in *Parkhurst v. State*, 628 P.2d 1369 (Wyo.1981), *cert. denied*, 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216. In that case, two suspects were stopped in their vehicle shortly after a murder had taken place. At the time of the stop, the police knew the identity of the assailants from the victim, a description of the suspects' car, and the direction and road they were travelling. The vehicle was described as a 1968 blue or green Ford Fairlane, but the car stopped by the police was a mid–60's blue Dodge. The driver was asked to produce his license which identified him as one of the assailants and was then asked to step out of the car, as was his brother who was also identified. The court concluded that "the police officers' conduct in making an investigative detention was reasonable since the record discloses ample grounds

for their suspicions concerning appellants." *Parkhurst*, 628 P.2d at 1376.

In *Cook v. State*, 631 P.2d 5 (Wyo.1981), the suspect was stopped under the following scenario: it was after 1:00 a.m. and an armed robbery had just taken place; a van carrying the defendant was stopped within one-half mile of the robbery as it was coming from a private area where it had no business being; and the van's passenger was noted to have hair length matching the description of the robber given by an eyewitness to the robbery. These "specific and articulable facts" coupled with "reasonable inferences by an experienced police officer, furnished ample grounds for finding a reasonable and objective basis for an investigatory stop of the van." *Cook*, 631 P.2d at 8.

In *Lopez v. State*, 643 P.2d 682 (Wyo. 1982), this court reiterated the test developed in *United States v. Cortez:*

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available * * *. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.
>
> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.
>
> The second element contained in the idea that assessment of the whole picture

must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. *Lopez*, 643 P.2d at 683–84 (quoting *Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981), *cert. denied*, 455 U.S. 923, 102 S.Ct. 1281, 71 L.Ed.2d 464).

This court said that probable cause need not exist before an investigatory stop is made but that based upon the totality of the circumstances, "the detaining officer must have a particular and objective basis for suspecting the particular person stopped of criminal activity." *Lopez*, 643 P.2d at 683 (citation omitted). In *Lopez*, the suspect was described as "a small, thin Mexican male wearing an orange T-shirt and some sort of wishbone design on the T-shirt" and driving towards Sheridan in a "tannish-colored older car, with no license plates and a Casper dealer's tag on the rear end." *Lopez*, 643 P.2d at 683. The court upheld the stop of Lopez based on this particularized description of the vehicle and suspect from an eyewitness.

In a case involving a stop of a suspected drunk driver, this court discussed opinions in other jurisdictions that held reports from citizen informants as presumptively reliable if they "also contain enough objective facts to justify pursuit and detention." *Olson v. State*, 698 P.2d 107, 110 (Wyo.1985). This court, however, determined that it need not reach the issue of whether the truck drivers' reports of the drunk driver's erratic driving was sufficient in itself because the police officer who then followed the suspect observed him exceed the speed limit, weave slightly and hug the exit ramp. *Olson*, 698 P.2d at 111.

*Other Jurisdictions:*

Recent cases from other jurisdictions have applied the specific articulable suspicion standard to instances where a suspect exhibits a certain known manner of behavior or dress known as a "profile." In *State v. Jones*, 114 N.M. 147, 835 P.2d 863 (App.

1992), the defendant, who was wearing gang apparel, was stopped and frisked while in the company of a known gang member and narcotics distributor in an area known for gang activity. The court held that absent any furtive mannerisms, gait or dress, there were no articulable facts that set defendant apart from innocent gang members in that location and the police action was found to be unwarranted.

A Maryland court recently found a search incident to a permissible stop to be invalid absent reasonable suspicion of criminal activity. In *Derricott v. State*, 327 Md. 582, 611 A.2d 592 (1992), the defendant was stopped for speeding and then based upon the facts that he was a young black male wearing gold jewelry, driving a sports car with a beeper and carrying papers with telephone numbers written on them, was subjected to a pat-down and search of his car, revealing drugs. The court held that even though the defendant may have matched a "drug courier profile" this was not enough to warrant a search or seizure and that "[w]ithout more, the attributes that the State claims were suspicious about Derricott's appearance simply are not enough to establish the requisite level of reasonable suspicion that Derricott was engaged in criminal activity." *Derricott*, 611 A.2d at 598. Derricott had not engaged in any suspicious behavior or acted in an unusual manner.

In a recent Massachusetts case, the police received a bulletin over the police radio informing them that a stabbing had taken place and describing the suspect as "a black male with a black ¾ length goose known as Angelo of the Humboldt group." *Commonwealth v. Cheek*, 413 Mass. 492, 597 N.E.2d 1029, 1030 (1992). Defendant was stopped wearing a ¾ length goose down jacket " 'in proximity' to where the stabbing occurred," known to be a high crime area. *Cheek*, 597 N.E.2d at 1031. In determining that the defendant was wrong-

fully stopped, the court found that the radio description was not sufficient to "single him out from any other black male in the area," defendant had not been fleeing the scene and evidence did not exist to show he was engaged in any criminal or suspicious activity. *Cheek*, 597 N.E.2d at 1031. The court held that to "permit police investigative stops under the sparse facts present in this case would be to encourage unduly intrusive police practices." *Cheek*, 597 N.E.2d at 1032.

The Tenth Circuit has recently held that where the suspect's nervousness was the only suspicious factor, such nervousness raised the degree of suspicion only minimally. *United States v. Hall*, 978 F.2d 616, 621 (10th Cir.1992). As defendant's nervousness was apparent only after being confronted by police officers, the court held it to be of little significance because the officers had "no prior contact with the [d]efendant with which to compare her behavior, thereby making defendant's nervous appearance to the officers merely a hunch." *Hall*, 978 F.2d at 621. The court recognized that it is "common knowledge that most citizens * * * whether innocent or guilty, when confronted by a law enforcement officer who asks them potentially incriminating questions are likely to exhibit some signs of nervousness." *Hall*, n. 4.

A Washington state court of appeals reviewed a case involving the stop of a suspect believed to be selling drugs based on a tip from a juvenile that the individual was "dressed in black and * * * was riding a motorcycle." *State v. Hart*, 66 Wash.App. 1, 830 P.2d 696, 697 (1992). The informant then pointed to the suspect as he approached and told the police officer, "That's him." *Hart*, 830 P.2d at 698. That court applied a two-prong test reformulated in *State v. Sieler*, 95 Wash.2d 43, 621 P.2d 1272 (1980) to determine whether reasonable suspicion existed to support the investigative stop of the suspect. The court reasoned that:

> An informant's tip possesses sufficient "indicia of reliability" where (1) the *informant* is reliable *and* (2) the informant's *tip* contains enough objective facts to justify the pursuit and detention of the suspect *or* the noninnocuous details of the tip have been corroborated by the police thus suggesting that the information was obtained in a reliable fashion. *Hart*, 830 P.2d at 700 (citations omitted).

The court determined the informant was reliable in that he himself was being detained for a traffic violation and was not anonymous, thus the first prong of the test was met. In analyzing the first alternative of the second prong of the test, the court concluded that the informant's tip lacked any objective facts to justify detention. This determination was made from the following facts: the informant had no basis for assuming that the suspect was selling drugs, only that the informant was looking to purchase drugs and was told that the suspect was in the area; the informant did not know where the suspect lived and had never been approached by the suspect to purchase drugs. The court reasoned, that based on this lack of any objective facts, the police officer could not evaluate whether the suspect was indeed selling drugs or whether the informant had "misconstrued innocent conduct." *Hart*, 830 P.2d at 701. Finally, the officer did not observe any " 'noninnocuous' conduct which tended to demonstrate that the informant's information was obtained in a reliable fashion." *Id.* Nor did the suspect's presence in a known drug traffic area "by itself give rise to a reasonable suspicion that he was engaged in criminal activity." *Id.* Moreover, the officer's observations of the suspect which conformed to the informant's description did not provide corroboration under the second prong.

In a recent situation where the defendant was followed at night, by two uniformed, armed policemen and ordered to "stop, halt right there" as he entered a dark apartment building and could go nowhere else, the Court applied *Hodari*, stating that

even when a "reasonable person" would have believed that he was not "free to leave" pursuant to an officer's injunction to stop, a defendant may not rely on such a "show of authority" to exclude evidence if he failed to *submit* to the officer's assertion of authority. Thus, pursuant to the Court's judgment in *Hodari D.*, we must determine (1) whether [the officer] used a "show of authority" to seize the appellant and (2) whether the appellant *submitted* to the assertion of authority.

*United States v. Wood*, 981 F.2d 536, 539 (D.C.Cir.1992). The test to determine whether a "show of authority" was made is "objective, and looks at the totality of the circumstances" including, among the other *Mendenhall* factors of consideration, the time and place of the encounter. *Wood*, 981 F.2d at 539.

Finally, the Tenth Circuit has stated:

Whether a particular encounter constitutes a consensual encounter or an investigative detention involving fourth amendment protections depends on whether a reasonable person under the circumstances would believe she was not free to leave and/or disregard the official's request for information. *United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir.1990) (citations omitted).

## ANALYSIS

To analyze whether appellant's Fourth Amendment rights have been violated by an impermissible stop and frisk, we must first consider whether appellant was stopped or "seized."

Writing for the Tenth Circuit Court of Appeals, Judge Brorby found the defendant to be "seized" for Fourth Amendment purposes when he yielded momentarily to a uniformed police officer's request to "hold up." *United States v. Morgan*, 936 F.2d 1561 (10th Cir.1991). The officer had previously followed the defendant for several blocks in a marked police car with its red light flashing. *Morgan*, 936 F.2d at 1567. This apparent show of authority was sufficient to implicate a *Terry* stop.

Applying the *Mendenhall* guidelines, the Connecticut Supreme Court in a recent decision determined appellant, who was stopped with a companion at 1:00 a.m. by an armed officer where no other persons were present, to be seized for purposes of the Fourth Amendment. *Connecticut v. Oquendo*, 223 Conn. 635, 613 A.2d 1300 (1992). The court determined that a reasonable person would not have believed he was free to leave.

In the instant case, Officer Lusher, while driving a patrol car, approached appellant late at night and called to him to stop. Appellant stopped at the officer's command. No one else was in the vicinity and a second officer, also in a patrol car, arrived in less than five minutes following Officer Lusher's stop of appellant. Whether the officers were armed or not is not known from the record. However, a reasonable person could deduce that he was not free to leave that situation and, as such, appellant was "seized."

Previous Wyoming cases can be distinguished from the facts presented here. Beginning with *Kelly*, this court has required that a search be supported by "other suspicious circumstances" in addition to the descriptive information given by an informant. Such circumstances are lacking in this case. In *Parkhurst*, the police knew the identity of the assailants from the victim, while in this case the identity of the prowler or whether a crime had been committed was not known. In *Cook*, an eyewitness to the robbery gave a physical description of the suspect, including his hair length, and the van when stopped was leaving a private area where it had no business being, indicating furtive behavior. In *Lopez*, an eyewitness gave a specific physical description of the suspect and his

vehicle. Unlike *Cook* and *Lopez*, the only eyewitness to the prowling incident could give only a vague, general description of the suspect and apparently never spoke to the police. At the time Collins was apprehended, whether a crime had taken place could not be verified, even by the supposed victim, Mr. Esquibel.

The only authority from this court cited by the majority is *Olson*. In that case, though initiated by reports from citizen informants, the police officer personally observed erratic driving sufficient to permit a stop for drunken driving. The majority cites this opinion to support an "investigatory stop." However, in our discussion in *Olson* we quote from *Cortez:*

> An investigatory stop must be justified by some *objective manifestation* that the person stopped is, or is about to be, engaged in criminal activity. * * * [T]he totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers *must have a particularized and objective basis* for suspecting the particular person stopped of criminal activity.

*Olson*, 698 P.2d at 110 (quoting *Cortez*, 449 U.S. at 417, 101 S.Ct. at 695, 66 L.Ed.2d at 628) (emphasis added). Determining that the officer had "reasonable and articulate suspicion based upon a totality of the circumstances" to stop the Olson vehicle, this court noted the independent corroboration of illegal activity from the officer's observations as well as the "generally nonconclusory" factual observations of the informers. *Olson*, 698 P.2d at 111.

In analyzing cases from other jurisdictions, it appears that certain descriptive profiles of gang members or drug couriers are not sufficient to justify a stop without the suspect exhibiting furtive behavior. *Jones* and *Derricott*. And even if the description is more specific, if it cannot distinguish the suspect from others in the area, it is not enough. *Cheek*.

Applying the test in *Hart* to the facts in the present case, we note Mr. Esquibel stated that his neighbor phoned him saying someone was prowling *around* his car and he did not recall if she said that someone had been *in* the car or not. Mr. Esquibel did not personally see the suspect, but remembers the description of the suspect given by his neighbor as a teenager, possibly a male; he did not remember specifically what description he gave to the officers; and Officer Lusher testified that Esquibel told him the suspect was a male with dark clothing. Mr. Esquibel could not determine, or did not notice, if anything was missing from his car and did not tell the officers that the umbrella was missing.

Considering first the reliability of the informant, it appears that the police never talked to the eyewitness, Mr. Esquibel's neighbor. There is conflicting testimony of what the officers remember as the description given by Mr. Esquibel and what he remembers his neighbor telling him. Under the first prong of the test in *Hart*, it is questionable as to whether Mr. Esquibel can be considered a reliable informant; he was not an eyewitness and could never confirm that anything had been taken from his vehicle. The description of the suspect, either a male in dark clothing or a male teenager of average size, did not provide specific information by which to identify the suspect, and appellant at the time was not a teenager, but twenty-nine years old. The description, plus the lack of evidence to support a theft, does not provide "objective facts to justify the pursuit and detention of the suspect." *Hart*, 830 P.2d at 700. Officer Lusher did not observe any "noninnocuous behavior" of appellant before the stop to corroborate the informant's tip. The apparent nervousness exhibited by appellant *after being stopped* cannot be considered in evaluating whether specific articulable suspicion existed *before* the stop, and using appellant's nervousness to support the seizure must be treated with caution. *Hall.*

As in *Wood,* the specifics surrounding the stop of appellant do not comprise elements of a "benign police/citizen encounter." We know that late at night, a uniformed policeman, driving a police car, ordered appellant to stop. Soon after this seizure a second uniformed officer, also in a police car, appeared on the scene. There is no question that both prongs of the *Hodari* test were met: appellant did not resist but rather submitted to the officers' show of authority.

Kelly Collins was stopped by the police based only on the description that a teenager or possibly a male in dark clothing had been sighted in connection with a possible car break-in. It is difficult to see how that description can be determined to be particular and articulable under this court's previous application of *Terry* and *Cortez.* Appellant was not furtive in his behavior, and no additional information existed to give rise to a belief that he was engaged in criminal activity. It was not until *after* appellant was stopped that the officer noted Collins was sweating and nervous and saw the umbrella handle sticking out of his coat sleeve.

Appellant was stopped in violation of his constitutional rights against unwarranted search and seizure and the evidence acquired as a result of the stop should have been suppressed. The majority today elects to close its eyes to the line of cases from this court requiring "reasonable" and "articulable suspicion" by choosing to call an investigatory stop, a "first tier encounter" or "contact" with a citizen. Majority opinion at 695. Disregarding the Fourth Amendment rights infringed by an unjustifiable stop, the majority is content to engage in semantics, calling what is really a "detention" or "seizure" an "encounter" or "contact" as if that would somehow make the erosion of these constitutional rights more palatable.

Despite the terms the majority may concoct to justify appellant's detention, the reality remains that appellant was stopped not because he "*did* anything to arouse individualized suspicion but because he was there * * *." *United States v. Rideau,* 969 F.2d 1572, 1580 (5th Cir.1992) (Smith, J., dissenting, in which Politz, Goldberg, Duhé, and Wiener, JJ., joined). What occurred to appellant is "akin to a general warrant." *Rideau,* 969 F.2d at 1580. Though the majority finds it relatively simple to ignore, I am cognizant that

indiscriminate searches and seizures conducted under the authority of "general warrants" were the immediate evils that motivated the framing and adoption of the Fourth Amendment. *Payton v. New York,* 445 U.S. 573, 583, 100 S.Ct. 1371, 1378, 63 L.Ed.2d 639, 649 (1980) (footnote omitted).

I respectfully dissent.